IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PATRICIA YOST,                          )
                                        )
          Plaintiff,                    )  Case No. CV04-1517-HU
                                        )
     vs.                                )  FINDINGS AND
                                        )  RECOMMENDATION
JO ANNE B. BARNHART,                    )
Commissioner, Social Security           )
Administration,                         )
                                        )
          Defendant.                    )
_____)

Rory Linerud
P.O. Box 1105
Salem,. Oregon 97308
     Attorney for plaintiff

Karin J. Immergut
United States Attorney
District of Oregon
Neil J. Evans
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

1   - FINDINGS AND RECOMMENDATION

Thomas M. Elsberry
Lucille G. Meis
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
        Attorneys for defendant

HUBEL, Magistrate Judge:

        Patricia Yost brought this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for disability insurance benefits and Supplemental Security Income (SSI) benefits.

### Procedural Background

        Ms. Yost filed an application for disability and SSI benefits on December 5, 2000. The application was denied initially and upon reconsideration. Ms. Yost requested a hearing, which was held on March 16, 2004, before Administrative Law Judge (ALJ) Gary W. Elliott. On April 12, 2004, the ALJ issued a decision finding Ms. Yost not disabled. On September 29, 2004, the Appeals Council declined Ms. Yost's request for review, making the ALJ's decision the final decision of the Commissioner.

### Factual Background

        Born November 14, 1951, Ms. Yost was 52 years old at the time of the hearing. She has a 12th grade education. Her past work experience includes employment as a wax assembler, a stock clerk-

checker in the apparel industry, a mill worker, a cashier/checker, an inventory clerk, and an electronics assembler. She alleges that she became disabled on May 15, 1995, from a combination of myofascial pain syndrome, osteoporosis, diabetes, and fibromyalgia. Ms. Yost seeks benefits for a closed period from November 15, 1995, the onset date originally alleged, to October 1, 2001, when she began working full-time.

### Medical Evidence

Ms. Yost was injured on April 12, 1994, when she was lifting a box of approximately 30-40 pounds over her head. Tr. 162. She felt a pull on the right side of her neck and shoulder, which developed into an ache. Id. She continued to work for a few days, but was then taken off work after notifying her supervisor of persistent pain. Id.

Ms. Yost was evaluated by Randale Sechrest, M.D., and by Kootenai Physical Therapy. Tr. 157. A complete series of spinal x-rays taken on April 22, 1994, showed some straightening of the lordotic curvature, possibly secondary to muscle spasm, but otherwise normal. Tr. 199. An MRI of the neck done on June 20, 1994, was normal. Tr. 162, 203. Dr. Sechrest took Ms. Yost off work for four months and prescribed physical therapy. Tr. 201.

At her initial physical therapy evaluation, Ms. Yost was observed to have decreased strength and flexibility, and pain with movements. Tr. 158. Ms. Yost received four physical therapy

3   - FINDINGS AND RECOMMENDATION

treatments, which ended on May 17, 1994. Tr. 154. At that time, she was released for light to medium work. Tr. 204. However, on May 26, 1994, Ms. Yost reported that she was unable to continue her job because of pain. Tr. 204. She returned to physical therapy until July 14, 1994. Id. Dr. Sechrest returned her to work without restrictions on August 30, 1994. Tr. 167, 201, 204. Ms. Yost terminated her employment shortly thereafter. Tr. 167, 201. Dr. Sechrest found Ms. Yost at maximum medical improvement on September 23, 1994, with no physical impairment. Tr. 167, 204. Ms. Yost did not treat with any physician or participate in a program after her release. Tr. 168.

Ms. Yost was off work until April 1995, when she began working for Conoco, a job that involved heavy lifting. Tr. 167, 201. In November 1995, she injured her neck and shoulders at the Conoco store. Tr. 167. She participated in physical therapy for a week, but the pain persisted. Tr. 167. She resigned her job with Conoco, and reported her injury to her employer. Id.

In November 1995, Ms. Yost began treating with Jay Maloney, M.D., for oral control of diabetes and for hypercholesterolemia. Tr. 202. Dr. Maloney referred her to physical therapy and a dietician. Id. Ms. Yost received physical therapy until December 6, 1995. Tr. 176.

On November 19, 1995, Ms. Yost presented at the emergency room of St. John's Lutheran Hospital, complaining of left side

pain radiating into the shoulder blade for the past three days. Tr. 183. She reported that the pain increased with movement, such as moving the head or the extremities, and with respiration. Id. The emergency room doctor diagnosed chest wall pain and prescribed 60 mg. of Toradol. Id. An EKG to rule out myocardial infarction was normal. Tr. 202.

On February 21, 1996, William Jay Riddel, a chiropractor, wrote a letter on Ms. Yost's behalf, in support of reopening Ms. Yost's worker's compensation claim. He stated that she was first treated in his office on November 1, 1995. Tr. 159. At that time, her presenting complaint was pain and numbness of the shoulders and neck, with aching in the arms and shoulders in the morning, and weakness in her lower back. Id. She also complained of dizziness, pain in her hands and hips, loss of sleep, and occasional headaches and fatigue.

Upon examination, Dr. Riddel found a 20% loss of cervical rotation to the left and a 70% loss of motion upon cervical rotation to the right. Id. Flexion of the cervical spine was painful and palpation revealed muscle tension of the cervical, upper and lower spine. Id. Dr. Riddel diagnosed cervicobrachial syndrome, cervical neuralgia/neuritis, lumbosacral plexus disorder, and lumbago. Tr. 160. Dr. Riddel recommended extension of the workers compensation claim. Id.

Ms. Yost was seen by Bernadette M. Martin, M.D., for a

rheumatologic consultation on May 2, 1997. Tr. 162. She complained of numbness in both arms at night and reported that any activity involving the use of her arms caused a pulling sensation in her neck and shoulders on both sides and eventually led to numbness. Id. Ms. Yost reported that she used her hands for housework, vacuuming, baking and crocheting, but performing these activities for prolonged periods caused her hands to become numb. Id. Ms. Yost said her hands also became numb with writing and driving, and that she was experiencing a pain in her wrist which developed into a shooting pain in her palm. Id.

Ms. Yost related that she often got up two or three times at night to sit in the recliner because of numbness and pain in her arms and shoulders. Id. She said she developed stiffness, soreness and numbness in her arms upon prolonged sitting, but that it was alleviated by getting up and walking around. Id.

Dr. Martin concluded that Ms. Yost's work injury in 1994 had developed into a myofascial pain syndrome on the right shoulder and upper back, which had progressed to a "mild fibromyalgia syndrome." Tr. 164. Dr. Martin noted "numerous tender points," but did not specify where the tender points were or how many she found. Dr. Martin strongly encouraged Ms. Yost to exercise regularly. Id. A review of Ms. Yost's cervical x-rays from April 1994 and November 1995 revealed that they were essentially normal with no significant discogenic or degenerative

joint disease seen. Id. Dr. Martin concluded, "Her problem is soft tissue in nature." Id.

On June 26, 1997, Dr. Sechrest wrote a letter stating that he felt the November 1995 injury had exacerbated Ms. Yost's pre-existing condition, but adding that "I suspect anything given the baseline condition of fibromyalgia would probably be temporary." Tr. 166. Dr. Sechrest felt that Ms. Yost's "current underlying problem of fibromyalgia is related to her initial injury" in April 1994. Id.

On September 22, 1997, Dr. Martin prescribed a course of physical therapy, twice weekly for eight weeks. Tr. 175. A physical therapy initial evaluation done by Amy Currie, PT, on September 29, 1997, noted that Ms. Yost's chief complaint was pain and weakness in the left shoulder and neck. Tr. 173. Onset was April 12, 1994, "with an exacerbation worsening over the last six months." Id. Ms. Yost characterized her pain as five on a ten point scale since being on anti-inflammatory medications during the previous week. Id.

Ms. Yost reported that she was seeing Dr. Riddel for chiropractic treatments every two weeks for her right hip and her shoulders and neck. Id. Ms. Currie opined that Ms. Yost's potential for improving left shoulder strength and bilateral shoulder range of motion to normal was fair, and thought these goals could be achieved within eight weeks. Tr. 174. Dr. Martin

signed off on the evaluation on October 3, 1997. Id.

Ms. Yost was evaluated by a four-doctor panel on February 11, 1998. Tr. 201. The evaluating doctors were a neurologist, Ethan Russo, M.D.; an orthopedist, Catherine Capps, M.D.; a pain management specialist, Martin Cheatle, Ph.D.; and Dana Headapohl, M.D., a specialist in occupational medicine. Id. The purpose of the evaluation was to determine Ms. Yost's current condition as it related to her injuries on April 19, 1994, and November 5, 1995. Id.

Dr. Headapohl noted that Ms. Yost's chief complaints were neck soreness radiating into the left shoulder, bilateral hand numbness with certain activities, including placing her hands over her head or in front of her body, and a "rush" similar to a feeling of light headedness or faintness, occurring with neck flexion or extension or when she is lying on her left side. Tr. 212. Dr. Headapohl noted that Dr. Russo had listened to Ms. Yost's arteries in her forehead and neck and found no abnormalities. Id.

Dr. Headapohl found no muscle spasm in the neck or back, but diffuse tenderness over both posterior shoulder girdles, the lumbar region and the upper thoracic region. Tr. 208. No trigger points were noted. Id. Her neck, shoulders, and all other joints showed full range of motion. Id. There was no joint swelling, erythema or tenderness. Id. Cranial nerves were intact, walking

was normal, coordination was good, reflexes were normal and symmetric, there was no focal atrophy, sensation was intact, and she showed no tremor. Id.

The MRI showed a minimal disc bulge at C6/7, but there was no impingement, and no clinical evidence of radiculopathy. Id.

Dr. Headapohl found no clinical evidence of fibromyalgia, and concluded that Ms. Yost's symptoms were more consistent with regional myofascial pain syndrome. Tr. 209. Dr. Headapohl concluded that Ms. Yost was medically stable and had an impairment rating of 3%. Id. She recommended that chiropractic manipulation not be continued. Id.

Ms. Yost acknowledged that she smokes one and a half packs of cigarettes a day. Tr. 213.

Dr. Capps noted that upon examination, Ms. Yost was tender over the spinous process of C6 through T5, and over the right paraspinous muscle of the left trapezius, the left pectoralis tendon, and the insertion of the left deltoid. However, Dr. Capps found "no true trigger points at any of these areas." Tr. 213. Dr. Headapohl found that Ms. Yost had excellent range of motion of her neck. Id.

Dr. Capps wrote, "At this point I do not see any evidence for true fibromyalgia as the patient has no trigger points although she does have tender spots in typical trigger point areas. I feel her condition is more akin to myofascial pain with

9  - FINDINGS AND RECOMMENDATION

musculomechanical neck pain." Tr. 214. Dr. Capp's diagnoses were myofascial pain syndrome cervical spine with associated musculomechanical neck pain; possible ulnar nerve compression in both elbows; and possible right carpal tunnel syndrome, with verification awaiting a nerve conduction study to be conducted by Dr. Russo. Id.

Ms. Yost received nerve conduction studies and an EMG from Dr. Russo, which revealed only mild right carpal tunnel syndrome. Tr. 211. Dr. Russo's physical examination was unremarkable. Electrodiagnostics showed mild left carpal tunnel, but no evidence of right carpal tunnel, ulnar neuropathy on either side, thoracic outlet syndrome nor radicular findings. Tr. 222. Dr. Russo concluded that Ms. Yost

> has had a couple of minimal minor on-the-job injuries
> that should have been self limited. She may fit
> clinical criteria of "fibromyalgia" but there was no
> evidence whatsoever that this semimythical pseudo-
> disease is actually precipitated by on-the-job
> injuries. ...

Tr. 222.

At his examination, Dr. Cheatle administered the Beck Depression Inventory, which indicated a very mildly depressed mood. Dr. Cheatle diagnosed myofascial cervical, bilateral trapezius and upper extremity pain syndrome; somatoform pain disorder; and adjustment disorder with depressed mood - mild. Tr. 219. He wrote,

> [P]atient presents as mildly depressed and she has
> adopted a very sedentary lifestyle. It is my sense
> that the patient has a myofascial syndrome which
> seems out of proportion with the mechanism of her
> alleged injury. There are no significant
> psychological factors requiring treatment and I sense
> a strong disease conviction. The patient at one point
> in the interview stated, "to be honest with you right
> now I feel disabled." I highly doubt any monetary
> secondary gain. She is receiving a very small lost
> wage benefit. ... The patient is in my opinion past
> a point of maximum functional improvement and could
> return to work within her limitations which may need
> to be quantified...

Tr. 220.

The four doctors submitted a letter stating that in their opinion, Ms. Yost had myofascial pain syndrome, but that there was no clinical evidence of radiculopathy, fibromyalgia or sclera derma. Tr. 224. They gave her a 3% impairment rating and concluded that she was able to work at sedentary to light jobs, without overhead work, awkward neck and back positions, awkward or static neck and back positions, or lifting on outstretched arms. Tr. 225.

There are no medical records for the period between March and March 1999. In April and May 1999, Ms. Yost was seen for a bone density study and a bowel complaint, which was resolved surgically. Tr. 227-229; 233-236. There are no other records for the year 1999. Ms. Yost's medical records from Cascade Medical Clinic, covering the period from June 2, 2000, to June 4, 2001, show routine care for diabetes, upper respiratory infections,

osteoporosis and hypertension. Tr. 263-268.

On February 28, 2001, Ms. Yost was seen by Tyler Arkless, M.D., for a comprehensive general examination, with specific reference to fibromyalgia, diabetes, pain syndrome, and osteoporosis. Tr. 242. No medical records were available. Id. Ms. Yost related that her diabetes was diagnosed in 1994, but that it was noninsulin dependent. Id.

Ms. Yost's presenting complaint was that her feet went to sleep after sitting for 15 to 20 minutes, and that her hands became numb with repetitive activity, such as prolonged use of a computer mouse. Id. She related notable problems with hand numbness back to 1994, with repetitive assembly line work. Id. Otherwise, she denied any intermittent or constant paraesthesia. Tr. 243. Ms. Yost described a chronic problem of having the sense that she was losing her balance with up and about activity, occurring three to four times per day; she was unable to describe this any better. Id. She also described brief vertigo occurring when she rose from a bent-over position and then looked up by tilting her head back. Id. Ms. Yost said she had been diagnosed with osteoporosis, but she denied any history of fractures. Id.

She described three separate chronic pain problems: bilateral neck through posterior shoulder girdle pain, chronic low back pain, and bilateral plantar heel burning pain. Id. Ms. Yost told Dr. Arkless she had been diagnosed with myofascial pain

syndrome for the first of these. The low back pain, she reported, was aggravated with prolonged standing. Id. The bilateral plantar heel discomfort accompanied prolonged sitting and walking, but she had not obtained a work-up or diagnosis for this condition, and was not using any orthotic devices. Tr. 244.

After physical examination, including digital palpation of the classic 18 fibromyalgia points, Dr. Arkless diagnosed the following: 1) Chronic cervico-dorsal myofascial pain of unclear etiology. Dr. Arkless noted that Ms. Yost did not use such medications as Flexeril or employ any cervico-dorsal stretching routines, and that her use of NSAIDs was minimal. 2) Chronic musculoskeletal low back pain of unclear etiology, without significant findings on physical examination except for some lumbar paraspinous muscle tension. The degree to which Ms. Yost's overweight status and apparent lack of physical conditioning and stretching affected this condition was unclear. 3) Possible trochanteric bursitis, myofascial syndrome of the gluteal/hip joint region, and/or tensor fascia lata syndrome. 4) Possible calcanal bursitis, achilles tendonitis, plantar fascitis, or other similar condition. 5) Mild bilateral carpal tunnel syndromes. 6) Adult onset non-insulin dependent diabetes under fair control. 7) Overweight, specific etiology unclear. "Diabetes as well as lack of exercise may be contributing to this condition." 8) Significant chronic use of cigarettes. 9)

13  - FINDINGS AND RECOMMENDATION

Generalized deconditioning secondary to lack of exercise and stretching routines. 10) Osteoporosis without history of fracture. "The degree to which this may be accounting for her upper and lower spine region symptoms is unclear." Tr. 252. With respect to fibromyalgia, Dr. Arkless wrote,

> In regards to concerns for fibromyalgia my overall impression was of only mild to moderate concern for classifying her with this condition at this time from a clinical standpoint. The ... findings of cervico-dorsal muscle tension and pain ... would seem to favor some more localized myofascial pain syndrome.

Tr. 253.

On July 6, 2001, Sharon Eder, M.D., an internist, performed a records review on behalf of the Commissioner. Tr. 288-295. Dr. Eder opined that Ms. Yost was able to lift 20 pounds occasionally and 10 pounds frequently; and stand and/or sit about six hours in an eight-hour workday. In Dr. Eder's opinion, Ms. Yost could stoop and crouch only occasionally because of her complaints of back pain, and should avoid hazards such as machinery and heights because her diagnosis of osteoporosis posed a danger of fracture. Id.

### Hearing Testimony

Ms. Yost testified at the hearing that was unable to work between November 1995 and October 2001[1] was because the "pain in

---

[1] In October 2001, Ms. Yost went to work for Monaco Coach, a job she held for 18 months, in which she assembled wiring harnesses for motor coaches. Id. The job entailed standing and sitting, and

my neck and shoulders got so bad that I couldn't stand for very long, I couldn't lift anything and I couldn't even lift my groceries or vacuum in my home." Tr. 388. She stated that it was hard to bend over because "I had so much pain in my neck and shoulders." <u>Id.</u> Ms. Yost related that she also had trouble standing and walking during that time. Tr. 389.

Ms. Yost testified further that when she awoke in the mornings, her arms and shoulders were numb, and that it took 45 minutes to an hour before the circulation returned. Tr. 391. She did not think she was able to lift more than five pounds on a regular basis. <u>Id.</u> Her hands also became numb, "like something was just tight around my wrists." Tr. 392. She said that when she stood for more than 10 minutes or sat on a concrete floor, her legs, particularly the left, became numb, her hips became sore, and her feet swelled. Tr. 392. Ms. Yost stated that between 1995 and 2001, she would have been unable to do assembly line work because within 15 minutes, her hands would fall asleep, her neck and shoulders would get stiff, and her hips would get sore. Tr. 393.

The ALJ called vocational expert (VE) Eileen Lincicome. Tr. 395. The ALJ asked the VE to consider a hypothetical individual who was the age of Ms. Yost and had the same work experience and

---

some lifting. Tr. 389-90. The job ended when Ms. Yost was laid off. Tr. 394.

education. The VE was asked to assume that the individual was able to lift 20 pounds occasionally and 10 pounds frequently, only occasional stooping and crouching, and avoiding concentrated exposure to hazards such as heights and moving machinery. Tr. 397. The VE testified that such a person would be able to do Ms. Yost's previous work as a cashier/checker, and other jobs such as automatic developer of photographs, parking lot attendant, and charge account clerk. Tr. 397-98.

The ALJ proposed a second hypothetical, with the lifting reduced to 10 pounds occasionally and less than 10 pounds frequently, able to stand and/or walk for two hours out of an eight hour day and sit for six hours, handling limited to occasional, and the same restrictions on stooping, crouching, and exposure to hazards. Tr. 398. The VE opined that with those limitations, Ms. Yost would not be able to perform her past relevant work, but could still perform the job of charge account clerk, as well as alternate jobs, including credit authorizer, and credit reference clerk.

### ALJ's Decision

The ALJ found that fibromyalgia was not medically determined for the closed period of disability, noting that "no physician has diagnosed" fibromyalgia, and in fact a number of medical sources had specifically stated that Ms. Yost did not appear to have fibromyalgia, including Dr. Arkless in February

2001. Tr. 19.

The ALJ found that the medical evidence did indicate that Ms. Yost had osteoporosis, diabetes and myofascial pain syndrome, that while severe, were not, alone or in combination, severe enough to meet or equal one of the listed impairments. Id.

The ALJ noted that the four-member team that evaluated Ms. Yost in February 1998 found that Ms. Yost had a 3% impairment rating for the myofascial pain of the upper back but was able to perform light exertion jobs, except that she was to avoid overhead work, awkward or static neck and back positions and lifting with outstretched arms. The ALJ concluded, "This finding, agreed to by four medical experts approximately two and a half years into the alleged closed period of disability, is persuasive evidence that Ms. Yost was neither mentally nor physically disabled. Her medical condition warranted limitations which will be noted below." Tr. 19-20.

The ALJ noted that the absence of any medical records for March-December 1998; the fact that the April and May 1999 medical records were limited to a bone density study and the bowel complaint; and the absence of any other records for the year 1999 and the first half of the year 2000. The ALJ concluded, "Thus the record reveals that from the point in early 1998 at which she was found capable of light work the claimant had no medical care for approximately three years for any of the allegedly disabling

conditions." Tr. 20.

The ALJ found no objective medical evidence of a condition to support the existence of Ms. Yost's alleged low back pain radiating into the left leg. He noted that in June 2000, Ms. Yost saw treating physician Sheryl Norris, M.D., for erratic blood sugars, and told Dr. Norris that she was walking five times a week and that she had "no complaints otherwise." See tr. 268. He also noted that the MRI study of the lumbar spine done in September 2002, nearly a year after the alleged closed period of disability, was essentially negative. The ALJ concluded, "As the alleged symptoms were unchanged one must consider that even a year after the alleged closed period there was no identifiable cause for the alleged back and leg pain." Tr. 20.

Similarly, the ALJ found no objective medical evidence supporting the existence of a condition that would cause Ms. Yost's alleged wrist and elbow problems. Tr. 21. He noted Dr. Norris's findings on May 4, 2001 that Ms. Yost's upper extremities were without pain or swelling of the phalanges, wrist or elbows (tr. 264), and concluded that there was "no support for the presence of wrist and elbow problems of any magnitude within the alleged closed period." Tr. 21. He noted that in June 2000 and as late as June 2001, during the time she was being treated by Dr. Norris, Ms. Yost made no mention of hand and elbow problems. Id. The ALJ also noted that although Ms. Yost had said

18  - FINDINGS AND RECOMMENDATION

in a letter dated March 22, 2004, that when she started working in October 2001, she thought the difficulty with her hands would be a significant barrier to employment, she was nevertheless able to do the job. Id.

The ALJ found Ms. Yost's testimony only partially credible. He observed that Ms. Yost had endeavored to use fibromyalgia as her reason for non-compliance in an exercise regimen, even though the treatment for fibromyalgia is exercise, citing Ms. Yost's statement to Dr. Norris in June 2001 that she was not exercising because of her "fibromyalgia" (tr. 263). The ALJ noted that Dr. Norris had discussed with Ms. Yost the importance of regular exercise and ways of initiating a sustainable program to address her diabetes and overweight status, but that despite such encouragement, Dr. Norris had recorded that Ms. Yost was reluctant to start an exercise program (tr. 263-64). The ALJ concluded, "It is felt that ongoing lack of compliance, resistance to medical instructions, lack of medical support for the alleged level of incapacitation ... raise credibility issues." Tr. 21.

The ALJ found that Ms. Yost was limited to light work, avoiding concentrated exposure to hazards such as heights and moving machinery because of the fracture risk created by her osteoporosis. The ALJ concluded that his first hypothetical to the VE most closely resembled Ms. Yost's functional limitations,

19  - FINDINGS AND RECOMMENDATION

and on the basis of her testimony, found that Ms. Yost had the residual functional capacity to return to her past relevant work as a cashier/checker, and to do the other jobs identified by the VE, including developer/photograph machine operator, parking attendant, and charge account clerk. Tr. 22.

### Standards

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must

demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

///

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. Yuckert, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. Yuckert, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other

work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

## Discussion

1.  Did the ALJ err by failing to accept functional capacity limitations found by the four-physician panel?

Ms. Yost asserts that although the ALJ accepted the diagnosis of myofascial pain syndrome made by the four-physician panel, he failed to incorporate their opinion that Ms. Yost was capable of engaging in light work that did not involve overhead reaching, awkward or static neck and back positions, or lifting with outstretched arms. She asserts that the ALJ erred in not including these limitations in the hypothetical to the VE, arguing that each of the jobs the ALJ found her capable of doing involves overhead work and lifting with outstretched arms.[2]

_____

[2] Ms. Yost cites to the Dictionary of Occupational Titles (DOT) job descriptions, and highlights acts she feels are inconsistent with these limitations. For the work of cashier-checker, DOT 211.462-014, DOT includes "[s]tocks shelves and marks prices," and "[m]ay weigh items, bag merchandise." For the work of photo finisher, DOT includes "[t]ends machine that develops sheets, strips, or continuous roll of film preparatory to printing: Pulls film through trapdoor into darkroom," [p]ositions racks of film on machine chain links according to developing time required or threads leader of continuous roll through machine, and "[m]ay tend equipment that develops, fixes image, and dries x-ray plates." DOT describes the work of a parking attendant, DOT 915.473-010, as including the following activities: "Places numbered tag on windshield of automobile [and] hands customer similar tag," and "[m]ay service automobiles with gasoline, oil and water." DOT describes the work of charge account clerk, DOT 205.367-014 as

23  - FINDINGS AND RECOMMENDATION

I disagree that the jobs of cashier-checker, parking lot attendant, and charge account clerk, as described in the DOT, necessarily involve overhead work and lifting with outstretched arms. But even if they did, these limitations, as found by the four-physician panel, appear to be based on nothing more than Ms. Yost's statements. There is no clinical evidence, found by the panel or in the medical records as a whole, of a condition which would be reasonably expected to result in such limitations.

The on-the-job injuries in April 1994 and November 1995 were characterized as "soft tissue" by Dr. Martin, and described as "minimal" and "minor" by Dr. Russo. Cervical x-rays taken in April 1994 and November 1995 were normal, without evidence of discogenic or degenerative joint disease. A complete series of spinal x-rays taken in April 1994 was normal. MRIs of the neck done in June 1994 and in February 1998 were normal. Dr. Russo found no vascular problems in Ms. Yost's head and neck. The panel found no muscle spasm in the neck or back, and full range of motion in the neck, shoulders and all other joints, intact cranial nerves, normal reflexes and sensation, and no clinical evidence of radiculopathy. Although Dr. Russo found that Ms. Yost had mild carpal tunnel syndrome on the left, he found no evidence of carpal tunnel syndrome on the right, or of ulnar neuropathy,

---

including the following activities: "completes application for customer," "[f]iles credit applications," "[m]ay check references by phone or form letter," and "using adding machine."

thoracic outlet syndrome, or other radicular findings.

In 2001, Dr. Arkless noted that Ms. Yost's complaints of pain and numbness in her hands, arms, shoulders, legs and feet were of "unclear etiology." His physical examination was also unremarkable.

The ALJ's decision, read as a whole, indicates that he did not include limitations on overhead lifting, awkward head and neck positions, and lifting with outstretched arms in his hypothetical to the VE because he had concluded, on the basis of other medical evidence, that there were no clinical findings of a condition which could cause the numbness of the hands, arms and shoulders that Ms. Yost described. There is substantial evidence in the record to support this conclusion, because the record shows that a number of medical examinations and diagnostic tests over a period of several years failed to disclose any underlying medical cause for the pain and numbness of the hands, arms and shoulders of which Ms. Yost complained. In addition, the record shows that in October 2001, Ms. Yost began working on an assembly line, in a job which required the use of her hands and some lifting, and that she continued to do this job for 18 months, until she was laid off.

The ALJ's decision not to include limitations on overhead lifting and lifting with outstretched arms is supported by substantial evidence in the record.

2.   Did the ALJ err in finding Ms. Yost only partly
credible?

Ms. Yost contends that the ALJ erred when he found that her allegations of problems using her hands during the closed period were not credible because these problems were not supported by medical evidence. Ms. Yost contends that the ALJ erred because she has "wrist and upper extremity complaints during the closed period," citing tr. 203, 214, 215.

I find no error by the ALJ. Ms. Yost's subjective complaints of numbness in her hands, arms and shoulders, in the absence of any clinical findings of a condition which could cause such symptoms, are not sufficient to establish the existence of a disability. Under the regulations, a disabling impairment is one resulting from an anatomical or physiological impairment that is "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). There is no medical evidence in the record to show that Ms. Yost's complaints of numbness in her hands, arms and shoulders are attributable to a medically determinable condition. The ALJ therefore properly concluded that they were not impairments and did not include them in his assessment of Ms. Yost's residual functional capacity.

The ALJ was also entitled to consider, as he did, the failure of any of Ms. Yost's doctors to prescribe, and Ms. Yost's failure to request, any serious medical treatment for allegedly

severe pain. <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1114 (9th Cir. 1999); *see also* <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 346 (9th Cir. 1991)(en banc)("unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" is a relevant factor in assessing credibility of pain testimony). The ALJ's credibility findings were also properly based on Ms. Yost's failure to comply with repeated advice from her doctors that she address her pain complaints with regular exercise and conditioning. See <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1166 (9th Cir. 2001)(in finding claimant not credible, ALJ properly considered absence of neurological or orthopedic evaluations showing disabling abnormality of claimant's upper or lower extremities; absence of prescriptions for analgesics commonly prescribed for severe and unremitting pain; lack of participation in any significant pain regimen or therapy program; and, to the extent that claimant's activities of daily living were limited, they were self limited by his lack of motivation to stop smoking and get on a program of physical reconditioning. The ALJ also properly noted significant periods during the closed period when her medical records fail to reflect treatment for her allegedly disabling conditions.

### Conclusion

The ALJ's decision is free of legal error and is based on substantial evidence in the record. I recommend that the

Commissioner's decision be affirmed, and that this action be dismissed.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due April 6, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due April 20, 2006, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 22nd day of March, 2006.

/s/   Dennis James Hubel
          Dennis James Hubel
United States Magistrate Judge